We have three cases set for oral argument this morning. We also have three cases that were submitted on the briefs. The first case is Pollack v. HHS. Mr. Nemeroff, did I pronounce your name correctly? Yes, that's correct, Your Honor. Okay, and you're reserving five minutes for rebuttal. Is that correct? Yes, Your Honor. All right, you may proceed. May it please the Court, Patrick Nemeroff on behalf of the Secretary of Health and Human Services. The Special Master here reasonably concluded, after a thorough review of the record in this case, that petitioners had failed to prove by a preponderance of the evidence that the medical condition of their son, K.P., was caused by his one-year vaccination. That finding is subject to the most deferential review possible. As long as the Special Master considered the relevant evidence, true, plausible inferences, and reasonably explained his findings, the Court of Federal Claims was required to uphold his decision. In reversing his decision, the Court of Federal Claims applied the wrong standard of review. It instead reweighed the evidence de novo and instituted its own findings. Because that was an error, that decision should be reversed and the Special Master's findings should be reinstated. Now, in concluding that petitioners had not met the burden of proof, the Special Master looked to their medical theory and compared that to what actually occurred in K.P.'s case and found that his medical condition did not deteriorate in the manner predicted by their theory. Didn't Judge Leto find that the Special Master mischaracterized Dr. Fry's medical theory? That is what the Court of Federal Claims found, but the Special Master's interpretation of medical theory was certainly supported by the evidence. So what Dr. Fry testified was that there are two different time frames. Did Dr. Fry say there's some rigid three-week rule for neurodegeneration? What he said was that there would be an initial setback, and what he actually said was that it would occur probably within a week of the inciting event. That's at page 349 of the record. And we had a week-long fever here, right? No, Your Honor. What we had was daycare records that showed a fever two days after the vaccine, then didn't show any fever, and then showed a fever nine days after the vaccine. And both of those fevers, I should say, were around 101 degrees. And what the Special Master reasonably concluded was that that wasn't the sort of dramatic setback that was predicted by Dr. Fry's theory, in part because there wasn't two or three consecutive days of fever. Dr. Fry said there would be some initial onset of some symptoms in that first week or so, but it wasn't expected there to be something dramatic. Well, if you look at the studies that Dr. Fry relied on and the example that Dr. Fry gave, you do see something more dramatic. So, for example, if you look at the Edmonds article that talked about neurodegeneration after an infection, there what that article looked to was motor and language delay, stroke episodes, deafness, and other symptoms. If you look at the Schaffner article, that was, of course, an actual autistic regression within two weeks. And then, finally, Dr. Fry gave the example of hemophilia, and there she lost the ability to climb stairs within six days of the vaccination. Well, I saw Dr. Fry's theory as not requiring a continuous downward trend, but rather a progressive trend, which means that some days can be better than others, and the progressive trend is consistent with the facts of the case, are they not? I don't think so, Your Honor, but first to his medical theory, the special master reasonably concluded that it did predict a continuous downward spiral, and that was because Dr. Fry himself described his medical theory as predicting a downward spiral that gets worse and worse over time. That's a progressive. Isn't that a progressive spiral or progressive trend? Well, that's right, Your Honor. I mean, his theory certainly predicted that KP's condition would get worse and worse after the vaccination, and what the special master concluded in looking at the evidence is that really his condition fluctuated, largely stayed the same for at least two or three months. I think the point that Judge Leto was trying to make was that it appeared that the special master put his own gloss on Dr. Fry's theory to the extent that the special master seemed to expect that every day KP would be worse than the prior day, that kind of downward spiral, where Dr. Fry's testimony and theory was really more about an overall trend going downward, and that can account for the fact that sometimes sick people feel a little bit better on one day than they did the prior day, but ultimately the overall trend is definitely going down, and that's what we have here, right? Nobody's disputing that between January 2005 and July 2005, KP was on a downward trend, right? Well, KP was certainly worse in July of 2005, but I think what the special master reasonably concluded was that he was not on a downward trend through those first three months after the vaccination. If you look at the actual evidence, we have the daycare records. That's because it seems to me that the special master is requiring that each day be worse than the preceding day. I don't think so, Your Honor. It's true the special master is looking at reports on a day-by-day basis, but that's the evidence that the special master has to look for. Now, if KP's condition had been steadily getting worse and there was one or two days where KP looked like his condition was better, I think the special master very well may have reached a different conclusion, but if you look at it here, what we have is the daycare records, which we only have a small sliver because petitioners didn't submit any other daycare records. He called it a progressive hill downward. Those are the words Dr. Fry used, a progressive hill downward, and hills have bumps, correct? I mean, you can encounter a bump as you're headed down a hill. The special master was not simply looking at mere bumps in the road and saying this is inconsistent with Dr. Fry's theory. The special master was looking at all of the evidence and finding that KP was not suffering this downward slope at all for several months after the vaccination. So the first thing to compare is if you look before the vaccination, KP was already suffering symptoms of neurodegeneration. He had been evaluated by kids as having delayed motor development and delayed speech development. His doctor had found ankle pain. This is an aggravated case, so obviously there was a preexisting condition to the vaccination. Well, the preexisting condition the petitioners point to is the mitochondrial defect, not prior neurodegeneration. But in any event, if you compare that condition, in the fall, in November and December, KP went to the doctor six times for ear infection and a rash. After his vaccination, he didn't see a doctor again until March, and then there was no notations about his developmental delay. Well, KP did go see that chiropractor like 10 times in February, and the chiropractor said that it's in the note that KP was spastic. So, I mean, it's a little bit of an overstatement to suggest that all was well with KP during January, February, and March, when the parents clearly were very concerned about his delay development and were trying to help their child by taking him to a chiropractor throughout all of February, and then the chiropractor sees pretty significant symptoms, spastic. And it appeared that the special master just completely ignored everything the chiropractor did based on a misunderstanding of a chiropractor note, and the special master, as you agree, incorrectly believed that the chiropractor was suggesting that there's no connection between the vaccination and the kid's current condition. Well, I think there are a couple of questions regarding the chiropractor's notes, and I'd like to address each of them. First, with respect to the notation that KP was spastic 23 days after his vaccination, the special master gave three very reasonable reasons why that wasn't strong evidence that he was suffering neurodegeneration or a downward decline. The first was that spasticity, as Dr. Fry testified, is closely related to increased tone in your muscles, and KP had already been diagnosed with increased tone before his vaccination. The second, as the special master noted in several places, and as Dr. Snodgrass specified, the chiropractor is not qualified to diagnose spasticity in the way that a neurologist is. And the third is that even after that notation that he was spastic, two days later or three days later, the chiropractor noted that he was doing better, that he was happier, he was more comfortable on all fours, that he was less stiff. That was over several days. So the chiropractor's notes themselves suggest that KP may have had a bad day that day, but then he had several good days afterwards. So they don't show this sort of downward slope that Dr. Fry's medical theory would have predicted. Now, with respect to the notation about whether vaccines were the cause, at the very least, the special master was correct that the chiropractor did not suggest that vaccines were a cause. All that notation shows that KP's social worker had brought up the possibility that vaccines were a cause. There's no indication that the chiropractor agreed. There's also no indication throughout any of the other records that any other of KP's medical providers thought that vaccinations might have been a cause of this neurodegeneration. And in fact, KP's own parents gave contemporaneous accounts that did not suggest that the vaccines were a cause. They indicated that he started to regress around 11 months old before his vaccinations, and that he then got worse again in April after that MRI. And if it's okay, I'd like to reserve my remaining time for a moment. Okay. Ms. Portman? May I proceed? Yes. If it pleases the court, counsel, my name is Sheila Bjorklund, and I represent Doug and Rhonda Pollock, who are parents of a now 11-year-old boy who was severely injured in 2005 through receipt of childhood vaccines. I think the overarching backdrop to the two issues before this court this morning is that the Vaccine Act is a remedial piece of legislation. As this very court has stated, as a remedial legislation, the Vaccine Act should be construed in a manner that effectuates the underlying spirit and purpose of the Act. Congress explicitly established the vaccine program as an alternative to the traditional civil tort system, which was not working. It wasn't working for vaccine manufacturers, and it clearly was not working for persons injured through receipt of vaccines. Case Attorney, your client was required to show by preponderance of evidence several elements. Do you want to get to that part of your case? I would be happy to, and also to address some of the comments that Mr. Nemeroff made. Judge Leto was given explicit authority under the enabling statute to be the checks and balance as to the special master in regards to whether or not a petitioner has met the preponderance of evidence as required by the statute. But it's not de novo review, right? In fact, it's about the highest level of deference that you can give. While this court has said the special master is to be accorded deference, this court is not a rubber stamp of the special master's decisions. The Court of Federal Claims was given explicit authority to review the record as a whole and to determine whether or not the special master has made findings of fact that are based upon the relevant evidence of record. We can get to that in a minute. There was ample explanation by Judge Leto where special master did not consider relevant evidence that was of record in reaching his determination. So could you identify the specific errors that the special master made that just didn't have any plausible basis? Certainly. First of all, the special master concluded that KP had evidence of central nervous system dysfunction prior to the receipt of his vaccine. As Judge Leto said, that was based on extremely thin evidence. Special master based his evidence on what he determined was his own diagnosis, particularly the statement he made of language delay absent some other known cause is inherently evidence of a central nervous system disorder. That was not evidence of record. There was no testimony by either of the experts in this case that Carl's slight language delay, he was just slightly delayed when he was evaluated by kids in October of 2004 in his language, that is not evidence of central nervous system dysfunction. Special master made that statement without evidence of testimony in the record, with no evidence of medical literature to support such a statement. He just pulled it out of the air. Second example where special master made error. The interpretation of the chiropractic record, contrary to what Mr. Nemeroff said, the respondent in this case agreed that the special master had totally misinterpreted the chiropractic records, particularly the telephone conversation between the chiropractor and a social worker involved in this case. It was not the social worker who suggested that there may have been some kind of vaccine reaction here, it was the chiropractor who brought that up to say there is no evidence of child abuse, which is what the social worker was alluding to in her conversation with the chiropractor, but the chiropractor says no, there is potentially vaccine reaction, cerebral palsy, some kind of tumor that's going on, something much more serious. Special master disregarded the chiropractor's finding of spasticity, pretty much based on Dr. Snodgrass's Ipsy-Dipsy type of statement of, well, I don't think chiropractors are qualified to make a diagnosis of spasticity. Chiropractors deal with muscle, deal with tendons, deal with the musculoskeletal aspect of the human body every day in their practice. They are very well qualified to identify spasticity. Are they qualified to offer a medical opinion? They're not a medical doctor, but neither is the special master, and the special master cannot offer a medical opinion either, which this special master attempted to do here. As Dr. Fry testified, on a continuum, spasticity falls here, slight increase in muscle tone falls here. In January of 2005, when KP received his vaccine, he was noted to have a slight increase in muscle tone, perhaps two beats of Clonax, which Dr. Fry testified were really insignificant findings in January of 2005. But within six weeks, to have a child who is spastic, who is crying when touched, that shows very rapid progression of something going on within the central nervous system. Thirdly, error that special master made. It was the improbable conclusion that the only reason Dr. McDonough, the treating pediatrician, sent KP to a neurologist in March was because he was frustrated with the Pollocks for not having taken him to occupational therapy or physical therapy. You will note in the records that were submitted as part of the appendix that the chiropractor notes that Carl had been receiving PT and OT since December of 2004, not on an everyday basis, but he had been attending. He was seeing the chiropractor because the parents thought that there was a musculoskeletal reason that was impeding his development as far as sitting, standing, et cetera. I'd like for you to address the issue of temporal proximity and especially the Edmonds paper and its implication on that issue. Dr. Fry's theory was that there will be an immune response following receipt of the vaccine. That immune response, as evidenced by fever, which Carl had, he had fever two days post-vaccination. He had fever later on. I believe it was January 21st, 21st and 31st after vaccination. That that is evidence of intracellular activity evidencing immune reaction, immune response. That then sets into action intracellular activity that will lead to cellular death, which will then lead to a clinical picture evidencing the neurodegeneration, but that won't happen for weeks after the initial immune response is noted. Dr. Snodgrass, respondent expert, agreed that you would see evidence of the neurodegeneration in a few weeks. That's exactly what we had here. We had Carl with fever day two, day nine after the vaccination. We had Carl with irritability. And then exactly three weeks and one day after he received his vaccine, we have him noted by the chiropractor to be spastic. None of the other physicians who had seen Carl over the previous months had noted any spasticity in this child. Now, the Edmonds paper. The Edmonds paper was dealing with ENT type of conditions in children with mitochondrial disease and what kind of a risk infection may pose to degeneration of those children's development.  The Edmonds paper, however, did show that neurodegeneration was evident. Neurodegeneration events were preceded by infection in 13 out of 18 patients. These were children with already noted mitochondrial disorders. Carl's was undiagnosed at the time he received his vaccine. This paper also said the timing of infections. In most of the patients, 10 out of 13, the neurologic events occurred three to seven days after the onset of infection and frequently appeared at a time when the infection was resolving. Carl had fever and irritability. He had not been an irritable child before. As Dr. Frey testified, that was evidence of an encephalopathy, that something was going on in his brain. He wasn't as old as some of the children in the Edwards paper, so he had not yet acquired some of the skills that they lost, which was also what Dr. Frey alluded to when he was comparing the Hannah-Pauling case to what had happened with KP here. KP became spastic. He had increased tone. As we went from February to July, he went from functioning at just about a 12-month level. So the special master used the Edmonds paper to set a three-week parameter, an outer bound, and much of the evidence that you rely on is outside of that three-week period. Now, when I look at the Edmonds paper and I look at the size of the population, the universe that's used to support the data and the conclusions in that paper, it doesn't seem to me to be of a sufficient size. Do you have any comment on that? As Judge Leto very correctly stated in his first opinion and then his final decision in this case, the entire area of mitochondrial dysfunction and how persons with mitochondrial dysfunction may be affected by immunization or other stressors such as infection, was a relatively new area of study in medicine and science at the time that this case was tried and at the time that the Edmonds paper came out. What Dr. Frey said is that this just shows us that persons who have dysfunction in their mitochondrial cells can be affected by infection. It's a bell curve. Some might be affected at this point. Some might be affected over at this point. Some, the bell, happened to be in the middle, which was the three to seven days. Judge Leto said that it was not appropriate to set a hard and fast boundary in this area of medicine that was just emerging and under continued scientific study. But Judge Leto said there was evidence of infection, which both experts here agreed was evidence of immune activation within the time frame, whether you want to take Special Master's first time frame of two weeks or his later time frame of three weeks, Carl clearly fit within either of those time frames for evidencing immune response. And that immune response was the fever and the irritability that he was expressing. I don't know if the court wants to go into any of the other arguments as far as the timing issue here. Okay. Judges of the Court of Federal Claims are explicitly given the authority under the Act, and it's Section 12E1B, to set aside any findings of fact or conclusions of law of the Special Master which are found to be arbitrary, capricious, and an abuse of discretion. If the Court of Federal Claims determines that the findings are arbitrary, capricious, an abuse of discretion, or not in accordance with the law, the statute then requires them to look at the record as a whole and to come up with their own, to make their own findings of fact and reach their own conclusions based on that record. That is exactly what Judge Leto did here. He determined that the Special Master's findings were arbitrary, capricious. I gave you some examples. I have more if you'd like. And determined they were not in accordance with the law, and he was required then to re-look at the evidence and to come up with his own findings of fact and conclusions. That's not an impermissible re-weighing of the evidence, as would be suggested by Mr. Nemiroff. He did exactly as he was required to do. In establishing the vaccine program in the Office of Special Masters, Congress said, as was underscored by the Supreme Court in Brunswick, the Special Master is an adjunct to the court. As this court recently said, a Special Master cannot manipulate the analysis in a manner calculated to arrive at a conclusion that he or she has already reached. That was a decision by this court in the Cohen case, which was decided December 4, 2014. This is precisely what the Special Master did here. He had a preconceived notion on how this case should be determined, and he set about to analyze it to meet his conclusions. Counselor, you're out of time. Do you want to give us a concluding sentence? Concluding sentence. Special Master, Judge Leto, was clearly within his statutory authority in making his own findings and conclusions in this case. His findings and conclusions are based upon the record. They must be upheld. Thank you. Thank you. Thank you, Your Honors. I'd like to start back with the three-week period that was just discussed. There are two points I want to make. First, three weeks is really at the outer bound of what the evidence in the record suggested for that initial setback. The three-week period was established on the basis of the Edmonds paper, correct? Well, the Edmonds paper, Dr. Fry's testimony in two places. Let's talk about the Edmonds paper first. So there's 400 different types of mitochondrial disorders, and the Edmonds paper is based on the universe of about, what,  That sounds right, Your Honor. Okay. Is it reasonable that that's a sufficient universe in order to make the type of conclusions that the Special Master arrived at? Well, the Special Master has to make his conclusions based on the evidence that's in the record. So petitioners gave certain evidence for what their medical theory is. The Edmonds article was one large part of it, and 19 days there was at the very end of the bell curve. Dr. Fry testified. He said the event would occur within one week. Later, he implicitly accepted three weeks by saying that they had evidence to show a setback within three weeks. And the other articles and other examples showed even shorter time frames. So all the evidence only supported that three-week time frame, and it was perfectly reasonable for the Special Master to look at that time frame. But I want to be clear, in footnote 78 of his opinion, the Special Master said that if there were a setback, you know, just after three weeks, at 23 days, 24 days, of course he would have looked at it. The only thing here that petitioners point to over and over again is this finding of spasticity by the chiropractor. But as I already discussed, there are— That was right on the outer bounds of three weeks, right? Right, but the Special Master discounted that finding not because it was at 23 days, but for the other three reasons that I indicated, because it was related to increased tone, because it was made by a chiropractor, and because three days later, the chiropractor said that KP was in a better mood. Two days after that, he said he was less rigid, more comfortable on all fours. And two days after that, he said he was less rigid, happier. So there was certainly sufficient evidence for the Special Master to conclude that that was not the sort of setback that petitioners' theory predicted. Now, the other thing I want to go back to is the Special Master's finding of neurodegeneration even before the vaccine, because that really illustrates that the Court of Federal Claims is applying the wrong standard here. The Special Master relied there on Dr. Snodgrass's testimony that what the kids' evaluation had found and what Dr. McDonough had found was evidence of neurodegeneration. And the Court of Federal Claims acknowledged that the finding was plausible, but said that those symptoms were not necessarily a result of a problem in the central nervous system. And for that reason, he set it aside. But that is not the proper standard of review. Under CEDEO, the Court of Federal Claims is compelled to uphold the Special Master's finding if the evidence in the record is not totally implausible. That's at 1338. In Hazelhurst, this Court said, reversible error is extremely difficult to demonstrate. All the Special Master must do is consider the relevant evidence, draw plausible inferences, and articulate a rational basis. That's certainly what the Special Master did here. And every instance in which the Court of Federal Claims attempted to find an error, really all the Court of Federal Claims was doing was reaching its own conclusion and rewriting the evidence. If there are no further questions... Thank you. Thank you.